# In the Iowa Supreme Court

---

No. 24–0029

Submitted October 7, 2025—Filed November 25, 2025
Amended December 4, 2025

---

**Robert Teig,**

Appellant,

vs.

**Brad Hart, Tyler Olson, Ann Poe, Patrick Loeffler, Dale Todd, Scott Olson,** and **Ashley Vanorny,**

Appellees.

---

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Linn County, Andrew B. Chappell, judge.

City council members who held a closed-session hiring interview of a candidate for city clerk seek further review of a court of appeals decision reversing the district court's order that the closed session complied with the Open Meetings Act. **Decision of Court of Appeals Vacated; District Court Judgment Affirmed.**

Mansfield, J., delivered the opinion of the court, in which all justices joined.

Robert L. Teig, Cedar Rapids, pro se.

Patricia G. Kropf, Assistant City Attorney, Cedar Rapids, for appellees.

Michael A. Giudicessi of The Iowa Freedom of Information Council, Des Moines, for amicus curiae The Iowa Freedom of Information Council.

Brenna Bird, Attorney General; Eric H. Wessan, Solicitor General; and Patrick C. Valencia, Deputy Solicitor General, for amicus curiae State of Iowa.

Leslie C. Behaunek and Adam P. Humes of Nyemaster Goode, P.C., Des Moines, for amici curiae Iowa League of Cities and the Iowa State Association of Counties.

Melissa A. Schilling and L. Lars Hulsebus of Dickinson, Bradshaw, Fowler & Hagen, P.C., Des Moines, for amicus curiae Iowa Association of School Boards.

**Mansfield, Justice.**

### I. Introduction.

> Reputation, reputation, reputation! O, I have lost
> My reputation! I have lost the immortal part of
> Myself, and what remains is bestial.

William Shakespeare, *Othello* act 2, sc. 3, l. 281–83.

The Open Meetings Act exists to give Iowans access to the deliberations and decisions of their government. This access, however, is not unlimited, and the Iowa Legislature has carved out exceptions. At issue here is Iowa Code § 21.5(1)(*i*) (2021), which permits governmental bodies to enter a closed session "[t]o evaluate the professional competency of an individual whose appointment, hiring, performance, or discharge is being considered when necessary to prevent needless and irreparable injury to that individual's reputation and that individual requests a closed session."

This case requires us to interpret the phrase "necessary to prevent needless and irreparable injury to that individual's reputation" in the context of hiring interviews. Before closing an interview, is the governmental body required to make an evidence-based determination that the particular interview will result in harm to the interviewee's reputation? Or may the governmental body adopt a working assumption that when an individual requests a closed session, closing the interview is a necessary precaution to protect against harm to the individual's reputation? For the reasons stated herein, we conclude that the latter interpretation is correct, and therefore we affirm the judgment of the district court and vacate the decision of the court of appeals.

### II. Facts and Procedural History.

On April 29, 2021, the Cedar Rapids City Council held a special meeting to interview Alissa Van Sloten for the position of city clerk. Van Sloten had

worked for the city for over ten years in various roles and was currently serving as interim city clerk. Due to the COVID-19 pandemic, the special meeting was conducted online. Council members Tyler Olson, Ann Poe, Patrick Loeffler, Dale Todd, Scott Olson, and Ashley Vanorny were in attendance, along with Mayor Brad Hart.

The public notice of the special meeting stated that the only agenda item would be the "[i]nterview of City Clerk candidate" and that the meeting "[m]ay be closed pursuant to Iowa Code Section 21.5(1)(*i*) (2021)."

Before the special meeting, Van Sloten requested in writing that she be interviewed in a closed session pursuant to Iowa Code § 21.5(1)(*i*). She later testified as follows under cross-examination:

> Q. . . . [W]hen you sent this request, were you concerned that there might be harm to your reputation if you were interviewed in public?
>
> A. I never know what's going to happen was going to be said inside a Closed Session or in an interview so, yes.
>
> Q. So it was just the possibility something might come up, or were there some specifics?
>
> . . . .
>
> A. I honestly don't recall what may have taken place over the last ten years that I've worked with some of the Council Members, so I don't know if something may have been asked. I don't know how council would have felt about anything that I would have done. It's similar to a performance appraisal, so.
>
> Q. So, but again my question is, were you concerned about something specific or was it just a possibility that something adverse might come up?
>
> A. It's the unknown. It's the unknown.

Van Sloten added that she did not know all of the council members well and did not know if some of them might have had issues with how she had done

her job in the past. Van Sloten would not have applied for the position had she believed that her interview would be public. She was aware that any interview in an open session would have been livestreamed on the City's social media page and then maintained on the internet indefinitely.

The City Council's interview packet included a scoring sheet of the interviewee on various characteristics and some preplanned questions. The questions included the following: "Give a specific example of a time when you had to serve an angry customer. What was the problem and what was the outcome?" and "Tell us about a time when you made a recommendation to someone who was skeptical or reluctant to accept the change. Describe what you did to encourage acceptance of the change, and if it wasn't successful, what you learned from the experience."

In the initial, open part of the special meeting, Mayor Hart announced that the purpose of the special meeting was to interview a candidate for the city clerk position and that the interview would be conducted in closed session. Mayor Hart invited a motion to enter a closed session and read the following: "Iowa Code Section 21.5(1)(*i*) (2021) allows a City Council to go into closed session when necessary to prevent needless and irreparable injury to the individual's reputation, and the individual has requested a closed session." Council member Scott Olson then moved to enter a closed session. The council members present voted unanimously to enter a closed session.[1]

The council members later testified that there appeared to be consensus within the council that a job interview should be closed upon the interviewee's request. None of them knew ahead of time that negative information would come

[1]Council member Ann Poe did not participate in this vote because she later joined the meeting after the closed session had begun.

up as to Van Sloten, but they all understood that there was no way of knowing whether adverse information would be disclosed either by Van Sloten or the other council members in the course of the interview.[2]

During the initial part of the closed session, the council discussed the status of the hiring process and the reasons other applicants had been screened out. The city attorney reminded the council that their closed-session discussions must remain limited to the purpose permitted by section 21.5(1)(*i*).

Van Sloten then joined the online meeting and was interviewed by the council. She fielded questions from the city's human resources representative and individual council members. As it turned out, the interview was positive in tone, and no negative information came to light. Once questioning was completed, Van Sloten left the meeting. The council discussed her candidacy, reaching a consensus to offer her the open position. The council then moved to re-enter open session, and the special meeting was closed. Van Sloten's hiring was approved at a later open meeting.

Robert Teig, a retired attorney and resident of Linn County, immediately complained about the April 29 closed session. Right after the session ended, Teig emailed the city attorney and council members asking, "If there is information supporting closing the session, may I have it, please? I don't understand how a job interview can result in injury to the applicant's reputation. What was the factual basis for closing the session?" Teig also sent additional emails directly to

---

[2]At trial, each council member was asked how they determined that a closed session was necessary. The council members gave various responses along a similar theme: "I felt to respect her wishes . . . we needed to keep it as a closed meeting"; "In my experience, conducting interviews . . . you just don't know what -- where things are going to go"; "I would not know what my Council Members may have wanted to ask of her and what could have been discussed or discovered"; "I wanted to be sure that any question I asked them would respect them and not compromise them in any way, shape, or form."

Van Sloten and various council members on May 5 (late evening), May 7, and May 12.

On May 28, Teig filed this suit in Linn County District Court seeking statutory damages and injunctive relief for violations of the Open Meetings Act. After a two-day bench trial, the district court concluded that the defendant mayor and council members had not violated Iowa Code section 21.5 when they held a closed session to interview Van Sloten. The court noted that "[t]he fighting issue amongst the parties . . . is whether a closed session was 'necessary to prevent needless and irreparable injury' to Van Sloten's reputation." The court reasoned that under section 21.5, the governmental body need not be aware of specific negative information before closing an interview at the interviewee's request. It therefore dismissed this case with prejudice.

Teig appealed, and we transferred the appeal to the court of appeals. The court of appeals reversed the district court's ruling with respect to section 21.5, holding that the city council violated Iowa's Open Meetings Act when it held a closed session on Van Sloten's request and without inquiring further into possible harm to her reputation. The court explained,

> So absent evidence that it is necessary to prevent needless and irreparable injury, the applicant's request to close the meeting does not meet the statutory requirements for maintaining the closed session. The governmental body must conduct further inquiry into the necessity of the closed session to ensure that the closed session complies with the statute. And a reasonable interpretation of the statute would allow for such inquiry to occur in a limited closed session, thus avoiding any "unrung bell" concern.

We granted the mayor and council members' application for further review. We have received amicus curiae briefs on both sides of the appeal, and we commend the amici as well as the parties for the quality of their briefs.

### III. Standard of Review.

We review the district court's interpretation of chapter 21 for correction of errors at law. *Hutchison v. Shull*, 878 N.W.2d 221, 230 (Iowa 2016). "[W]e accord a trial court's factual findings the same degree of deference we accord a jury's special verdict." *Id.* at 229. "[F]actual findings by the trial court are binding if substantial evidence supports them." *Id.*

### IV. Legal Analysis.

**A. Interpreting Iowa Code Section 21.5(1)(*i*).** Iowa Code section 21.5 of the Open Meetings Act addresses closed sessions. It provides that a governmental body "may hold a closed session only by affirmative public vote of either two-thirds of the members of the body or all of the members present at the meeting." Iowa Code § 21.5(1). In addition, such a closed session may be held "only to the extent [it] is necessary for any of the following reasons." *Id.* One of the permissible reasons is "[t]o evaluate the professional competency of an individual whose appointment, hiring, performance, or discharge is being considered when necessary to prevent needless and irreparable injury to that individual's reputation and that individual requests a closed session." *Id.* § 21.5(1)(*i*).

The district court and the court of appeals have divergent readings of section 21.5(1)(*i*). In the district court's view, the governmental body may close a job interview based on the interviewee's request "and its members' own concerns about what might come up in the meeting." The governmental body need not have specific information about a reputational threat before it.

The court of appeals disagreed with this "precautionary" approach. According to the court of appeals, the governmental body must have "evidence" of an actual reputational threat before closing a job interview.

We are more persuaded by the district court's interpretation. "Necessary" is a term whose meaning depends peculiarly on the context. Consider, for example, the well-known discussion of the "necessary and proper" clause from Article I, Section Eight of the United States Constitution in *McCulloch v. Maryland. See* 17 U.S. (4 Wheat.) 316, 413–14 (1819) ("[The word 'necessary'] admits of all degrees of comparison; and is often connected with other words which increase or diminish the impression the mind receives of the urgency it imports."); *see also Nehring v. Smith*, 49 N.W.2d 831, 833 (Iowa 1951) ("The word (necessary) is often employed as somewhat analogous to 'expedient' or 'appropriate.' " (quoting *Getchell & Martin Lumber & Mfg. Co. v. Des Moines Union Ry.*, 87 N.W. 670, 671 (Iowa 1901))).

Also, what is necessary to prevent something depends on what you are trying to prevent. Avoiding harm to one's reputation is an especially delicate task. In evaluating whether the defendants' de facto policy of closing job interviews at the interviewee's request was "necessary" to avoid harm to the interviewee's reputation, we ought to consider the alternatives proposed by Teig and the court of appeals. If they aren't feasible and workable, then that supports the defendants' view that their approach *was* necessary.

The court of appeals suggested that the governmental body could first conduct a limited closed session to find out if any damaging information might come up during the interview—and thereafter reopen and reclose the session as appropriate during the course of the interview. But opening and closing and reopening and reclosing a job interview would be unwieldy. The statute contemplates a single session ("a closed session") that would "evaluate the professional competency of an individual." It does not mention multiple closed sessions—or a combination of closed and open sessions.

Furthermore, section 21.5(1)(*i*) treats hiring, performance, and discharge the same way. Thus, by the court of appeals' reasoning, a *performance* review of a city manager or a school superintendent could not occur in a predetermined closed session; rather, the performance review would have to go step by step, with a segment closed if it related to something that might be notably harmful to the individual's reputation and open otherwise. In applying the Open Meetings Act, "[w]e seek to avoid interpretations that would produce strained, impractical or absurd results." *Tel. Herald, Inc. v. City of Dubuque*, 297 N.W.2d 529, 532 (Iowa 1980) (en banc). We think the court of appeals' reasoning leads to such a result.

As the witnesses below testified and the district court recognized, it's simply unrealistic to know in advance what will come up in a job interview that might harm the interviewee's reputation. Generally, the interviewee won't know what questions are going to be asked, and the interviewers won't know what answers will be given or what follow-up questions will be asked. It's also difficult for the interviewing entity to appreciate what might be harmful to the interviewee's reputation, especially in this day and age of proliferating social media.

Interviews tend to be more productive when they aren't limited to happy talk. Useful interviews commonly probe the candidate about their perceptions of their own weaknesses, mistakes they may have made, and differences they may have had with others at work.

Moreover, under the court of appeals' interpretation, the fact that the governmental body closed part of a job interview would amount to a finding that there was "specific, damaging information that would justify continuing the

interview outside the public's view." This *in itself* could harm the interviewee's reputation.

Additionally, as noted by one of the amici, to obtain a closed interview, a job candidate might have to volunteer sensitive information that they believe is irrelevant to the hiring decision—even though that information might never have come up otherwise.

Teig echoes the reasoning of the court of appeals. He also adds that because no negative information about Van Sloten emerged during her interview, it never should have been closed in the first place. But the statute is prophylactic—"necessary to prevent." Iowa Code § 21.5(1)(*i*). A fire extinguisher doesn't become unnecessary just because it isn't used. Thus, the relevant inquiry should not be whether harmful information came up during the interview, but whether Teig has an alternative, workable approach that would have ensured in advance that no harm would befall Van Sloten's reputation. Here he falls short.

Our reading of section 21.5(1)(*i*) also avoids creating friction between that section and section 22.7(18) of the Open Records Act. Section 22.7(18) of the Open Records Act defines "confidential records" as including "[c]ommunications not required by law, rule, procedure, or contract that are made to a government body . . . by identified persons outside of government, to the extent that the government body receiving those communications from such persons outside of government could reasonably believe that those persons would be discouraged from making them to that government body if they were available for general public examination." *Id.* § 22.7(18).

Since 1988, we have held that section 22.7(18) authorizes a governmental body to categorically withhold outside employment applications where the applicant did not authorize disclosure. *See City of Sioux City v. Greater Sioux City Press Club*, 421 N.W.2d 895, 898–99 (Iowa 1988) ("It is the legislative goal to permit public agencies to keep confidential a broad category of useful incoming communications which might not be forthcoming if subject to public disclosure. We believe that employment applications fall within this area of legislative concern."); *see also Clymer v. City of Cedar Rapids*, 601 N.W.2d 42, 46 (Iowa 1999) (noting that the legislature has "cloak[ed] employment applications with privacy").

Just last year, we held that Teig was not entitled to obtain the job applications of anyone outside the Cedar Rapids city government who had applied for the city clerk job. *Teig v. Chavez*, 8 N.W.3d 484, 488 (Iowa 2024). We again noted that "job applications are generally protected from disclosure," unless the person is an existing employee of the governmental body. *Id.* Notably, we do not require an individualized determination by the governmental body before keeping a particular job application private; simply put, "[s]ection 22.7(18) protects applications received from external candidates." *Id.* at 495.

Van Sloten, of course, was an internal candidate. However, if we adopted Teig and the court of appeals' reading of section 21.5(1)(*i*), any *outside* candidate for a government job in Iowa could shield their application, including their identity, from public disclosure, *see Teig*, 8 N.W.3d at 488, 495, but any job interview they had with the governmental body would generally be public. This strikes us as inherently unworkable. How would questioning of the outside candidate proceed? Would questioners be unable to refer to the application? *See* Iowa Code § 21.5(1)(*a*) (authorizing a closed session "[t]o review or discuss

records which are required or authorized by state or federal law to be kept confidential"). Would the outside candidate have their identity concealed during the public interview? *See Diercks v. Scott County*, 17 N.W.3d 364, 367 (Iowa 2025) (noting that the committee to select a county supervisor by appointment held a public meeting to discuss the candidates but referred to the candidates by number rather than name to protect the confidentiality of their applications). Alternatively, would the governmental body opt for a workaround, such as having each member of the body interview each candidate one-on-one, followed by an open meeting where the candidates were discussed by number? *See id.*; *see also Tel. Herald*, 297 N.W.2d at 532–34 (holding that interviews with less than a majority of council members were not "meetings" under the Open Meetings Act). Or would the governmental body delegate hiring decisions to an unelected official?

Teig maintains that the district court's reading turns the phrase, "when necessary to prevent needless and irreparable injury to that individual's reputation," into superfluous language. *See* Iowa Code § 4.4(2) ("In enacting a statute, it is presumed that . . . [t]he entire statute is intended to be effective."). But that's not correct. The language still requires the closed session to be for the purpose of protecting the individual's reputation, not (for example) to conceal a corrupt hiring arrangement from public scrutiny. Here, there is no suggestion of bad faith. The city council members simply relied on their common experience that a closed session is needed to protect against harm to an individual's reputation when the individual requests a closed session and the give-and-take of the interview cannot be predicted.

One of the amici raises a separate argument against the district court's interpretation. If a governmental body can close hiring interviews at the

interviewee's request without a specific finding of a specific danger to reputation, then "no meaningful review can occur." But section 21.5(5) addresses this potential problem. It requires the governmental body to keep detailed minutes and to audio record the closed session. *See id.* § 21.5(5)(*a*). And when an action is brought, the court may order in camera examination of the minutes and the recording, which is what happened here. *See id.* § 21.5(5)(*b*)(1). This procedure allows for a meaningful review of the governmental body's claim that the closed session related solely to the evaluation of professional competency of an employee or prospective employee.

Lastly, we emphasize that a closed session requires the agreement of both the governmental body and the individual being evaluated. *See id.* § 21.5(1), (1)(*i*). An individual who prefers to be interviewed in open session will always have that choice. Likewise, a governmental body that prefers public interviews of job candidates will always have that option. *See id.* § 21.5(6) ("Nothing in this section requires a governmental body to hold a closed session to discuss or act upon any matter.").

"We adhere to our view that the open meetings law is to be liberally construed." *Donahue v. State*, 474 N.W.2d 537, 539 (Iowa 1991) (en banc); *see also* Iowa Code § 21.1 ("Ambiguity in the construction or application of this chapter should be resolved in favor of openness."). "It was however for the legislature to set its parameters." *Donahue*, 474 N.W.2d at 539. We hold that the decision to close the April 21, 2019 hiring interview of Van Sloten, at her request and to protect against harm to her reputation, complied with those legislative parameters.

**B. Other Arguments on Appeal.** Teig raises two additional arguments on appeal. First, Teig contends that the minutes and recording of the closed session,

which became exhibits during trial, should be made public. The district court, following the protocol set forth in section 21.5, ordered the minutes and the recording turned over to Teig during discovery. *See* Iowa Code § 21.5(5)(*b*)(1) (authorizing the court to turn over the minutes or recording to the party seeking enforcement of chapter 21.5 after weighing "the prejudicial effects to the public interest of the disclosure of any portion of the minutes or recording in question, against its probative value as evidence in an enforcement proceeding"). But the court also ordered that the minutes and the recording be filed under seal and maintained in the EDMS as confidential exhibits.

We see no error here. The first sentence of section 21.5(5)(*b*)(1) states that the minutes and recording "shall be sealed and shall not be *public* records open to *public* inspection." *Id.* (emphasis added). The following sentences provide that the district court, after following a designated procedure, "may permit inspection and use of all or portions of the detailed minutes and audio recording by *the party* seeking enforcement of this chapter." *Id.* (emphasis added). Thus, the statute distinguishes between public inspection and party inspection. Public access doesn't necessarily follow from party access if the district court ultimately determines that the session was properly closed. That's what occurred here.

Second, Teig contends that the district court erred in closing the courtroom during the trial. But the district court *didn't* close the courtroom. It noted that the council members' request to close the courtroom was a "semantic question" because no one other than the parties and their counsel was present.

Teig refers us to *Telegraph Herald*, where we said that if the sealed records of the closed session "are of probative value in these cases, they ordinarily will surface and become public in an enforcement trial." 297 N.W.2d at 535. We do

not view that statement as a holding of the case. In any event, no one else attended this particular enforcement trial.

### V. Conclusion.

For the foregoing reasons, we vacate the decision of the court of appeals and affirm the judgment of the district court.

**Decision of Court of Appeals Vacated; District Court Judgment Affirmed.**